**UNITED STATES DISTRICT COURT**
**DISTRICT OF ALASKA**

UNITED STATES OF AMERICA,

Plaintiff,

vs.

NICOLE SPADARO,

Defendant.

3:24-CR-00024-SLG-MMS-1

**REPORT AND RECOMMENDATION**
**ON MOTION TO SUPPRESS [DKT. 24]**

## I.    MOTION PRESENTED

The indictment, filed in February of 2024, charges Nicole Spadaro ("Spadaro") with one count of possession of a controlled substance with intent to distribute.[1]  Dkt. 2.  Ms. Spadaro filed a motion to suppress evidence stemming from her encounter with law enforcement on September 25–26, 2023, and the subsequent searches of her luggage.  Dkt. 24.  She argues (1) that the initial interaction with law enforcement exceeded those permissible under *Terry*; (2) that law enforcement did not have reasonable suspicion, let alone probable cause, to detain and arrest her; (3) that her statements and consent to search her luggage were tainted not only by this prior lack of justification, but that law enforcement forced admissions by prohibiting her from using the restroom after her flight despite many repeated requests to do so, including expressing pain.  *See generally, id.*  The

---

[1] 21 U.S.C. § 841(a)(1), (b)(1)(C).

government responded in opposition, arguing (1) that it had reasonable suspicion to detain Ms. Spadaro under the totality of the circumstances and that its detention of her was reasonable; and (2) Spadaro's admissions and consent to search her luggage were voluntary, largely because they occurred outside of when she was requesting to use the restroom. *See generally*, Dkt. 29.

The government requested "an evidentiary hearing to settle any factual disputes between the parties." *Id.* at 2. Ms. Spadaro's brief was silent as to whether an evidentiary hearing was necessary. This Court does not find that one would assist in this matter because the parties appear to agree on the underlying facts. The government provided what it represents to be the audio from the event. Dkt. 29, Ex. 2 ("G-2"). Spadaro references an audio recording but did not provide it. The exhibit provided by the government appears to correlate with the times referenced by Spadaro in her motion, so this Court will accept that this is the same recording and will consider it for the purposes of this motion. The parties' first exhibits (Dkt. 24, Ex. 1 ("P-1"), and Dkt. 29, Ex. 1 ("G-1")) are also identical aside from immaterial differences in redactions. As such, this Court believes that the parties have jointly presented sufficient facts to obviate the need for an evidentiary hearing.

This Court hereby issues its Report and Recommendation regarding Spadaro's Motion to Suppress. Dkt. 24. For the reasons below, the Motion to Suppress should be **DENIED**. 28 U.S.C. § 636(b)(1)(B).

//

//

//

## II.    FACTUAL BACKGROUND

**Initial Contact**

Ms. Spadaro was flying back to Anchorage after spending time in Phoenix, Arizona on September 25, 2023.  P-1 at 3.  Law enforcement was alerted that she was a suspicious traveler and decided to speak with her in the concourse in Ted Stevens Airport.  *Id.*  Law enforcement identified several reasons why they suspected Ms. Spadaro was carrying controlled substances into Alaska.  First, Phoenix is a known source city of narcotics and Anchorage is a known destination for those narcotics due to the high retail value of drugs in Alaska.  *Id.*  Second, Ms. Spadaro's ticket back to Anchorage was purchased as a one-way ticket, which departs from typical passenger behavior and is often employed by those seeking to evade law enforcement.  *Id.*  Third, her ticket was purchased one day prior to her travel, which similarly departs from typical passenger behavior but aligns with the actions of many drug traffickers.  *Id.*  Fourth, the phone number on Ms. Spadaro's ticket was not hers, suggesting that another person purchased her ticket for her.  *Id.*  Fifth, that phone number was linked to Zane Finger, who was the subject of a controlled purchase of methamphetamine previously.  *Id.*  Sixth, Ms. Spadaro had her own prior connections to drug trafficking.  *Id.*

At 11:47 p.m.,[2] Airport Interdiction Investigator Andrew Gault ("Investigator Gault") approached Ms. Spadaro with an accompanying officer to ask her about her travel. G-2 at 0:00–0:45. Investigator Gault and the other officer were in plain clothes and did not

---

[2] This Court will subsequently refer to the timestamps in the government's audio exhibit instead of referring to the time in the evening.

have their weapons drawn.  P-1 at 3.  Ms. Spadaro was noticeably anxious and placed her

carryon luggage between herself and law enforcement.  *Id*.  Investigator Gault asked her

several questions, including whether she packed her luggage herself and if she was carrying

anything for someone else.  G-2 at 0:40–3:05.  He also asked her about when she purchased

her ticket, and she answered that she had purchased her ticket herself a few weeks prior.

*Id.*  Law enforcement knew this to be false, as the phone number used when purchasing the

ticket was not hers, and it was purchased the day before.  P-1 at 3.  After about three minutes

into the recording, Ms. Spadaro appears to request to use the restroom, but law enforcement

told her that she was not free to leave and moved her to the police department office near

the Transportation Security Administration screening checkpoint, otherwise known as

"TSA" or "security."  G-2 at 3:00–10; P-1 at 3.

**Subsequent Interview**

Ms. Spadaro was read her *Miranda* rights approximately five minutes after her

initial contact with law enforcement.  G-2 at 5:10–50.  After a few more questions, Ms.

Spadaro admitted to being around drugs within the last twenty-four hours, but she

emphasized that she was merely visiting family in Phoenix for a few days after seeing a

friend in Las Vegas for five or six days.  *Id.* at 6:00–7:35. Investigator Gault asked "[w]ould

you consent to a search of your checked luggage for controlled substances?"  *Id.* at 7:35–

43. After clarifying that he meant to say carryon luggage, Ms. Spadaro agreed.  *Id.* at 7:45–

50.

After about nine minutes, Ms. Spadaro asked to use the restroom again.  *Id.* at 9:20–

30.  Investigator Gault responded that his team would need to find a female officer to

accompany her. *Id.* at 9:30–45. Ms. Spadaro stressed that she had not been able to use the restroom during the flight and that she really needed to use the restroom, but she responded "that's fine" to waiting for a female officer. *Id.*

Law enforcement conducted an Ionscan of Spadaro's hands. *Id.* at 13:13–30; P-1 at 3. This came back positive for fentanyl and methamphetamine. G-2 at 15:20–35; G-3 at 1. After several exchanges in which Gault asked Ms. Spadaro if she was trafficking drugs and for whom she was doing it, she asked for a cigarette break. G-2 at 22:23–30. She repeated that she needed to use the restroom. *Id.* at 22:35–41. They did not have a female officer on site, but Ms. Spadaro agreed with law enforcement that they could place tape over the sensor that would automatically flush the toilet and that she was not permitted to manually flush it. *Id.* at 23:00–25. About three minutes later, the audio cuts out, representing the break where Ms. Spadaro was able to use the restroom. *Id.* at 26:28.

After restarting the recording, law enforcement also advised Ms. Spadaro that she could have a cigarette break. *Id.* at 26:50. Before going on that break, Investigator Gault informed her that her checked bags tested positive for heroin and methamphetamine. *Id.* at 26:50–27:00; G-3 at 3–6. After several more questions, law enforcement gave Ms. Spadaro time for a break. *Id.* at 42:10.

Ms. Spadaro then apparently made several inculpatory statements to Investigator Gault, but because the two were outside, the audio only clearly reflects Investigator Gault's questions and reactions to Spadaro's statements. *Id.* at 53:50–55:46. Investigator Gault asked if he could search her bag, advised her that she had constitutional rights and that is

why he asked for her consent, and explained that he could obtain a search warrant instead. *Id.* at 56:22–57:15.

After going back inside, Ms. Spadaro made statements and apparently nodded in agreement to being paid via Cashapp, but she also admitted to drugs being in her green checked bag and then consented to a search of that bag. *Id.* a 1:01:10–1:02:07. Law enforcement found a vacuum sealed bag of blue pills smelling of gasoline that weighed over a kilogram. P-1 at 3. Law enforcement then clarified whether she had also consented to the search of her second checked bag, and Ms. Spadaro did not give an audible answer. *Id.* at 1:13:55–1:14:05. However, it appears from the audio that the bag was being searched in front of her, and with there being no audible sign of objection, she likely indicated her consent nonverbally. Law enforcement found additional blue pills. P-1 at 3. Ms. Spadaro later consented to a download of her cellphone and gave law enforcement the passcode to access it. G-2 at 1:22:05–1:23:50. After several more questions and few more inculpatory statements, Ms. Spadaro was released around 1:50 a.m. *Id.* at 1:27:30–1:59:00.

## III. DISCUSSION

This Court finds that law enforcement had reasonable suspicion to detain Ms. Spadaro and that such detention was reasonable. It also finds that the government has met its burden to establish that Ms. Spadaro consented to the searches of her luggage. As such, the motion to suppress should be denied.

//

//

### a. Law enforcement had reasonable suspicion to stop Spadaro and hold her luggage and any arrest was supported by probable cause.

The Constitution protects individuals "against unreasonable searches and seizures[.]" U.S. Const. Amend. IV.  However, not every interaction with law enforcement implicates the Fourth Amendment.  Law enforcement enjoy similar privileges as members of the public, meaning that just as anyone can approach an individual to begin a conversation, so can law enforcement.[3]  Simply asking "questions [ ] if the person is willing to listen, or [ ] offering in evidence in a criminal prosecution his voluntary answers to such questions" does not convert a conversation into a seizure.  *Id.*  However, law enforcement needs reasonable suspicion before detaining an individual.[4]  Reasonable suspicion is more than a mere hunch.  Rather, it is an objectively reasonable belief that criminal activity "may be afoot" "supported by articulable facts[.]" Id.  This standard is below probable cause and even "is considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.*

> A person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. [. . .] As long as the person to whom questions are put remains free to disregard the questions and walk away[.][5]
>
> In the context of an airport:
>
> [W]hen an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to

---

[3] *Fla. v. Royer*, 460 U.S. 491, 497 (1983).
[4] *United States v. Sokolow*, 490 U.S. 1, 7 (1989).
[5] *United States v. Mendenhall*, 446 U.S. 544, 545 (1980).

investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope.[6]

The Fourth Amendment protects individuals from unreasonable arrests. Without an arrest warrant, law enforcement must demonstrate that it had probable cause to arrest the defendant.[7] However, not every encounter with law enforcement amounts to an arrest. *Id.* "Whether an arrest has occurred depends on all the surrounding circumstances, including the extent to which liberty of movement is curtailed and the type of force or authority employed." *Id.* It is not enough for one to believe that he is not free to leave, but rather, whether a reasonable person would believe that he is being subjected to more than temporary detention.[8] "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'"[9] However, the authority to detain, once employed, must be reasonable. *Id.* at 99. If law enforcement employs excessive force for a detention, or a person would have reasonably assumed that he was being taken into custody indefinitely, a detention may transform into an arrest.[10]

Warrantless arrests require probable case.[11] Probable cause exists when the totality of the circumstances would lead a reasonable person to conclude that there was a fair probability that a crime had been committed.[12] Mere suspicion or a hunch is insufficient,

---

[6] *United States v. Place*, 462 U.S. 696, 706 (1983).
[7] *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir. 1987).
[8] *United States v. Hernandez*, 322 F.3d 592, 596–97 (9th Cir. 2003).
[9] *Muehler v. Mena*, 544 U.S. 93, 98 (2005).
[10] *United States v. Patterson*, 648 F.2d 625, 634 (9th Cir. 1981)
[11] *Michigan v. Summers*, 452 U.S. 692, 700 (1981).
[12] *United States v. Valencia-Amezcua*, 278 F.3d 901, 906 (9th Cir. 2002).

but officers do not need to have conclusive evidence of guilt.[13] "[P]roof beyond a reasonable doubt," is not "required for probable cause to arrest."[14]

The government argues that the initial encounter was not a seizure under the Fourth Amendment, but concedes that a seizure occurred once Spadaro was informed that she was not free to leave. Dkt. 29 at 9. It also argues that it had reasonable suspicion to detain Ms. Spadaro and that the duration of the detention was reasonable. *Id.* at 8–15. This Court mostly agrees.

At the time of the initial contact, law enforcement did not have weapons drawn. They approached Ms. Spadaro as anyone else in the concourse could have. These first few minutes did not constitute a seizure of Ms. Spadaro, but in any event, law enforcement had reasonable suspicion at that point.

When law enforcement first engaged Ms. Spadaro, they knew (1) that Ms. Spadaro was flying from a known source city (Phoenix, Arizona) of controlled substances en route to Alaska; (2) that the trip was purchased as a one-way ticket, which departs from typical passenger behavior and mimics those intending to evade law enforcement; (3) that the ticket was purchased the day before the flight, similarly departing from typical traveler behavior; (4) that the phone number on the reservation was linked to a person (Zane Finger) associated with controlled substances; and (5) that Ms. Spadaro had a personal history of being associated with controlled substance trafficking herself. *See*, P-1 at 3.

---

[13] *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).
[14] *United States v. Talley*, 12 Fed.App'x 512, 513 (9th Cir. 2001) (internal citation omitted).

Spadaro argues that her connections to controlled substances were too attenuated for law enforcement to rely on them. Dkt. 24 at 17. She notes that she was not convicted for drug offenses and that the incidents had occurred several years prior. *Id.* The incident report refers to four matters. First, that Spadaro was "linked to two incidents involving drug sales in 2018." P-1 at 3. Second, that "she has associations with persons involved in drug trafficking." *Id.* Third, that "[i]n 2019, she was the subject of a tip in which she purchased a one-day way ticket from Phoenix to Anchorage and was suspected of body-carrying controlled substances." *Id.* And fourth, that she was involved in a fatal vehicle collision in 2020 as a passenger and that her driver (the deceased) had been convicted of trafficking methamphetamine. *Id.* As to Zane Finger, the report reads that he "was mentioned in a case in 2022 where he was the subject of a controlled purchase of methamphetamine[.]" *Id.*

This Court is sympathetic to Ms. Spadaro's arguments. Each fact that law enforcement had known at the time could be argued to be simply innocent behavior or at least not itself indicative of actively committing a crime. However, law enforcement must be allowed to draw from multiple sources, and draw reasonable inferences therefrom, when making a reasonable suspicion determination. Reasonable suspicion is a relatively low standard. With the breadth of information that law enforcement had, this Court believes that there was reasonable suspicion to approach and then detain Ms. Spadaro.

After engaging with Ms. Spadaro, law enforcement also observed her body language. Spadaro appeared to be anxious, hyperventilating, and sweating. *Id.* She also placed her carryon bag between herself and law enforcement, who believed that these

behaviors contributed to their initial suspicion. This Court agrees that these behaviors could be subject to a benign interpretation. Being approached by law enforcement after a several hour flight could easily be a stressful experience. However, law enforcement was permitted to take these observations into account in light of the facts that initially amounted to reasonable suspicion. Law enforcement also learned that Ms. Spadaro had given them false information pertaining to who purchased her ticket and when. *Id.* Law enforcement believed that these smaller lies were intended to prevent discovery of her criminal actions. *Id.*

The government concedes that Ms. Spadaro was detained under the Fourth Amendment once she was informed that she was not free to leave after the brief conversation in the concourse. Dkt. 29 at 9. Nevertheless, it argues that her detention was reasonable and did not amount to an arrest. However, Ms. Spadaro was detained in a police station for nearly two-hours, asked intrusive questions, was not free to leave, and was informed as law enforcement discovered more and more incriminating evidence. This Court is not prepared to find that she was never under arrest during this period, as a reasonable person knowing what she knew under these circumstances may have reasonably believed that she was being taken into custody indefinitely. However, this Court does not believe that this threshold would have been crossed until after Ms. Spadaro was informed that law enforcement was discovering the controlled substances. It also finds that after law enforcement found the controlled substances, there was probable cause to arrest her for drug trafficking.

### b. Spadaro's admissions and consent to have her luggage searched were not impermissibly tainted.

Warrantless searches are "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions."[15]  Consent is one of these few exceptions.  *Id.*  To determine whether consent was given voluntarily, courts must look to the totality of the circumstances.  *Id.* at 226.  It is the government's burden to establish that the defendant consented to a search.  *Id.* at 222.  The Ninth Circuit has identified five factors to consider, none of which being controlling:

> (1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was told he had the right not to consent; and (5) whether the defendant was told that a search warrant could be obtained.[16]

Ms. Spadaro argues that her consent was tainted because (1) it was the product of an unlawful seizure; and (2) that it was coerced from her by law enforcement withholding her access to the restroom.  Dkt. 24 at 18–19.  For the reasons stated *supra*, this Court does not agree with the first argument because it finds that the detention was proper.  The government argues that the five factors weigh in favor of a finding that Spadaro's consent was voluntary and that the timeline for Ms. Spadaro's argument is not supported by record. Dkt. 29 at 15–17.

First, the audio recording reflects that Ms. Spadaro first asked to use the restroom after about three minutes and asked again about six minutes after that.  G-2 at 3:00–3:15

---

[15] *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967).
[16] *United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000).

and 9:25–30. While she was initially not permitted to use the restroom due to a lack of female officers on the scene, Investigator Gault was able to arrange for an exception for her by taping over the flushing sensor and agreeing with her not to manually flush the toilet. *Id.* at 23:00–30. She was permitted to use the restroom about twenty-three minutes after initially asking. *Id.* at 26:28. Ms. Spadaro consented to the search of her carryon bags about four minutes after she had first asked to use the restroom. *Id.* at 7:35–50. Her subsequent consents and admissions were given after she was permitted to use the restroom. *See, e.g.*, *id.* at 55:26–56:00. While this twenty-four minute period was undoubtedly uncomfortable, the timing of the initial consent was only a few minutes after she first asked (inclusive of the time to walk to the police station) and she continued to consent and make admissions after she was able to use the restroom. As such, this Court does not find that this delay was coercive.

As to the five factors, this Court agrees with the government that they weigh in favor of a finding of voluntariness. First, Ms. Spadaro was detained and read her *Miranda* rights. Second, there is no indication from the record that law enforcement had their weapons drawn at any point, but especially not when they asked for her consent to the searches. Finally, Investigator Gault explained to Ms. Spadaro that she had the right not to consent and explained that he would otherwise get a search warrant. *Id.* at 56:20–57:15.

As such, while it may or may not have been in Ms. Spadaro's pecuniary interest to consent to the searches, and it was almost certainly not advisable for her to make such decisions prior to receiving advice from counsel, her consent appears to have been freely and voluntarily made. This Court's opinion is bolstered by its complete review of the audio

exhibit, which reflects an uncomfortable, but ultimately lucid and thoughtful, Ms. Spadaro

consenting to the searches after a lengthy discussion with law enforcement.

As such, this Court finds that the government has met its burden to demonstrate

consent to the searches.

## IV.    CONCLUSION

For the reasons set forth above, Spadaro's Motion to Suppress should be **DENIED**.

28 U.S.C. § 636(b)(1)(B).

DATED this 7th day of August 2024, at Anchorage, Alaska.

_____
MATTHEW M. SCOBLE
CHIEF U.S. MAGISTRATE JUDGE

Pursuant to D. Alaska Loc. Mag. R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than the CLOSE OF BUSINESS on August 21, 2024.  Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal.  *Miranda v. Anchondo*, et al., 684 F.3d 844 (9th Cir. 2012).  The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation.  *United States v. Howell*, 231 F.3d 615 (9th Cir. 2000).  Objections and responses shall not exceed five (5) pages in length and shall not merely reargue positions presented in motion papers.  Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support.  Response(s) to the objections shall be filed on or before the CLOSE OF BUSINESS on August 28, 2024.  The parties shall otherwise comply with provisions of D. Alaska Loc. Mag. R. 6(a).  Reports and recommendations are not appealable orders.  Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.  *See Hilliard v. Kincheloe*, 796 F.2d 308 (9th Cir. 1986).